UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PAUL TENORIO,

                Petitioner,

                                        ORDER
     v.                              25-CV-722-SJB-JMW

ANA PAULA NUNES VIEIRA,

                Respondent.
----------------------------------------------------------------X
**BULSARA, United States District Judge:**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    <u>INTRODUCTION</u>

      1.    Petitioner Paul Tenorio ("Tenorio") seeks the return of his son, S.E.V.T., to

Portugal for custody proceedings, pursuant to the Hague Convention on the Civil

Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct.

25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, and its implementing legislation, the

International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*

(Compl. dated Feb. 7, 2025 ("Compl."), Dkt. No. 1 ¶ 1–2).

      2.    Tenorio alleges that his wife, Ana Paula Nunes Vieira ("Vieira"),

wrongfully removed S.E.V.T. from Portugal to New York on December 21, 2024, and

has chosen to remain in New York with him ever since.  (Compl. ¶ 17).

3.     After conducting an evidentiary hearing and a review of the record,[1] the Court concludes that Tenorio has established Portugal was S.E.V.T.'s habitual residence, and Vieira wrongfully removed S.E.V.T. in violation of Tenorio's custody rights. Accordingly, the Court grants the Petition and orders S.E.V.T.'s return, subject to financial undertakings placed upon Tenorio.

4.     The Court's findings of fact and conclusions of law, as required by Fed. R. Civ. P. 52(a)(1), follow.  To the extent there are facts cited in the Conclusions of Law ("COL"), they are incorporated into the Findings of Fact ("FOF") and vice versa.

## FINDINGS OF FACT

5.     On February 7, 2025, Tenorio filed this Hague Petition seeking return of S.E.V.T. to Portugal.  (Statement of Undisputed Facts, included in Joint Pretrial Order dated Apr. 4, 2025 ("Statement of Facts"), Dkt. No. 31 ¶ l).  On February 11, 2025, the Court set a preliminary injunction briefing schedule and hearing date and ordered that Vieira not remove S.E.V.T. from the Eastern District pending resolution of the preliminary injunction motion.  (Order dated Feb. 11, 2025).  Vieira filed a divorce action in Nassau County Supreme Court on February 13, 2025.  (Statement of Facts ¶ li). In accordance with Hague Convention procedures, Tenorio signed a Voluntary Return Letter Acknowledgement on February 28, 2025, authorizing the U.S. Central Authority to send Vieira a Voluntary Return Letter informing her of the Petition.  (Voluntary Return Letter Acknowledgement dated Feb. 28, 2025, Pet'r's Ex. 128).

---

[1] Both sides agreed to enter all exhibits into evidence, without objection, except Pet'r's Ex. 132.  (Trial Tr. dated Apr. 10, 2025, at 47:17–48:21).  Pet'r's Ex. 132 was not entered into evidence and the Court does not rely on it in rendering its decision.

6.     By letter dated February 17, 2025, Tenorio and Vieira informed the Court of their agreement to keep S.E.V.T. within E.D.N.Y. during the pendency of this case. (Joint Letter dated Feb. 17, 2025, Dkt. No. 13).  Vieira also agreed to give her attorney her and S.E.V.T.'s passports until the conclusion of the case.  (*Id.*).

7.     The Court held a scheduling conference on February 19, 2025.  (Minute Entry and Order dated Feb. 19, 2025).  At the conference, the Court granted Tenorio's motion to expedite and set a schedule for pretrial submissions.  (*Id.*).  Magistrate Judge Wicks then set an expedited discovery schedule.  (Minute Order dated Feb. 28, 2025).

8.     A two-day evidentiary hearing was held on April 10, 2025, and April 22, 2025.  (Minute Entry and Order dated Apr. 10, 2025; Minute Entry and Order dated Apr. 23, 2025).  The Court heard certain live, in-person testimony at the hearing. (Minute Entry and Order dated Apr. 10, 2025).  Following the second day of testimony, the Court set a schedule for the submission of post-trial proposed findings of fact and conclusions of law, responses in opposition, and video testimony.  (Minute Entry and Order dated Apr. 23, 2025; *see* Trial Tr. dated Apr. 22, 2025, at 219:1–220:23).  A total of nine witnesses testified, four in-person and five through video depositions: the in-person witnesses were Tenorio, Vieira, Brenda Humburger, and Karol Puccio; remote deposition testimony was provided for witnesses Paula Amaral, Alberto Augusto Liberal DaFonseca, Marta Reis, Pedro Jose Vasconcelos, and Diana Vasconcelos.[2]

---

[2] The parties agreed to the admission of these witnesses' remote depositions in their entirety as trial testimony without objection.  (Transcript of Status Conference dated April 1, 2025, at 7:15–9:3, 11:7–15; Pet'r's Letter dated May 16, 2025 ("Pet'r's Dep. Letter"), Dkt. No. 37 at 1; Resp't's Letter dated May 16, 2025 ("Resp't's Dep. Letter"), Dkt. No. 39 at 1).  Depositions were also offered for two additional witnesses: Vieira

Briefing concluded on May 16, 2025.  (*See* Reply Mem. of Law dated May 16, 2025, Dkt. No. 40).

9.      Tenorio is a dual citizen of Ecuador and the United States.  (Statement of Facts ¶ iii; U.S. Passport of Paul E. Tenorio, Pet'r's Ex. 3).  He was born in Ecuador. (Trial Testimony of Paul Tenorio dated Apr. 10, 2025, ("Trial Tr. (Tenorio)"), at 5:16). He is a permanent resident of Portugal, (*id*. at 5:18–19), and resides in Porto, Portugal. (*Id*. at 5:23–6:1).  Tenorio speaks Spanish, English, and Portuguese.  (*Id*. at 26:1–2).

10.     Vieira is a dual citizen of Brazil and the United States.  (Statement of Facts ¶ iv; U.S. Passport of Ana Paula Nunes Vieira, Resp't's Ex. 4).  She speaks Portuguese and Spanish, and has a basic understanding of English.  (Trial Tr. (Tenorio) at 25:21–24).

11.     Tenorio has three adult children from his prior marriage.  (Trial Tr. (Tenorio) at 15:21–16:1).  Vieira has two children, Brenda Humburger and P.A., from two prior relationships.  (*Id*. at 22:4–6, 22:13–14, 22:20–22; Trial Testimony of Brenda Humburger dated Apr. 22, 2025, ("Trial Tr. (Humburger)"), at 201:19–22).  P.A. and Brenda are both U.S. citizens.  (Trial Tr. (Tenorio) at 24:3–9).  P.A. is 13 years old; Humburger is approximately 25 years old.  (*Id*. at 27:22–28:4, 112:1–3).

12.     Tenorio and Vieira first met in October 2015 through Tinder, an internet dating platform, when she was living in Brazil and he was living in the United States.

---

and Isabel Malheiro.  (Pet'r's Dep. Letter at 1).  As discussed below, Vieira objected to the admission of Malheiro's testimony.  *See infra* COL ¶ 36.  The Court does not consider Malheiro's testimony, and it is not in evidence.  *Id.*  Vieira also objected to the admission of her deposition, which Tenorio then withdrew; accordingly, Vieira's deposition is also not in evidence and not relied on by the Court.  (*See* Resp't's Dep. Letter at 2; Pet'r's Dep. Letter at 2).

(Trial Tr. (Tenorio) at 17:3–16, 17:24–25; Trial Testimony of Ana Paula Nunes Vieira dated Apr. 10, 2025, ("Apr. 10 Trial Tr. (Vieira)"), at 131:12–13). In late 2025, they met in person in Quito, Ecuador, where Tenorio's family lived. (Trial Tr. (Tenorio) at 17:10–20, 20:4–8).

13.    After meeting in person several more times, Tenorio and Vieira discussed Vieira moving to the United States. (Trial Tr. (Tenorio) at 22:7–9). To do so, Tenorio applied for and obtained a "fiance visa" for Vieira. (*Id*. at 22:7–12, 23:6–16). Vieira then came to the U.S. with P.A. in January 2017, and they lived together with Tenorio at his home in Garden City, New York. (*Id*. at 23:24–24:2, 27:1–4, 27:15–17, 53:20–21).

14.    Vieira and Tenorio were married in New York on April 6, 2017. (Statement of Facts ¶ v; Apr. 10 Trial Tr. (Vieira) at 131:12–16). Prior to doing so, they entered a prenuptial agreement. (Trial Tr. (Tenorio) at 96:16–18; Apr. 10 Trial Tr. (Vieira) at 131:22–132:5; Prenuptial Agreement dated Apr. 2, 2017, Resp't's Ex. 11). Under the agreement, Vieira would receive nothing from Tenorio's real estate holdings if the parties were to get divorced. (Trial Tr. (Tenorio) at 96:19–97:2).

15.    After getting married, Tenorio and Vieira continued to live together with P.A. in Tenorio's Garden City house. (Trial Tr. (Tenorio) at 26:24–27:3, 53:20–21; Apr. 10 Trial Tr. (Vieira) at 138:10–12). P.A. was four years old at the time. (Trial Tr. (Tenorio) at 27:5–7). Brenda came to live with them approximately three months later. (*Id*. at 27:1–4; Trial Tr. (Humburger) at 201:23–202:7).

16.    The couple eventually decided to have a child together, (Trial Tr. (Tenorio) at 28:19–21), and S.E.V.T. was born in February 2020. (Statement of Facts

¶ vii).  S.E.V.T. is a citizen of the United States.  (*Id.* ¶ viii; U.S. Passport of S.E.V.T., Pet'r's Ex. 2).

17.    In April 2021, Tenorio and Vieira began discussing the idea of moving from New York to Portugal.  (Trial Tr. (Tenorio) at 33:2–13; Apr. 10 Trial Tr. (Vieira) at 134:12–18).  Around that time, they visited Portugal and decided that, if they were to move, it would be to the city of Porto.  (Trial Tr. (Tenorio) at 34:21–35:2).  But beyond this starting point, Tenorio and Vieira gave vastly differing accounts of their desires and intentions regarding all aspects of their move to Portugal: whether it was intended to be a temporary or permanent relocation; whether it was a joint or unilateral decision made by Tenorio; and whether Vieira objected to the move at the time, or only after arriving in Portugal.  Both gave diametrically different self-serving accounts that appeared to be enhanced by their respective interests in the litigation, and as a consequence, much of their respective testimony was not credible.  Some facts and assertions were undisputed—likely because counsel simply failed to ask their client about the particular opinion proffered by their spouse.  Had a question been posed, the answer would have undoubtedly been the exact opposite of what the other side said.  This, unfortunately, is not uncommon in Convention litigation.  In this case, the Court was left to parse the facts based largely on documentary evidence, because the live witness testimony was not particularly helpful.  Where appropriate, the findings of fact note where a particular relevant fact is undisputed, agreed upon by both parties, or in dispute.  Ultimately, despite the absence of credible testimony from either side, the objective evidence— documents and in some instances the testimony of third-party witnesses—demonstrates

that Vieira was under a fair degree of financial coercion and economically dependent upon Tenorio to move to Portugal, but did agree to set up at least temporary roots there, as evidenced by her own affirmative efforts (albeit joint) to select, purchase, and design a home and bring her siblings from Brazil to Portugal. It is also beyond question that she was increasingly unhappy living in Portugal and sought a return to the United States and a life separate from Tenorio. But the efforts she took to establish connections and a life in Portugal—including enrolling S.E.V.T. in school—established Portugal as the child's habitual residence. *See infra* COL ¶¶ 10–11.

18.    Vieira testified that it was Tenorio's idea to move to Portugal. (Apr. 10 Trial Tr. (Vieira) at 134:14–16, 155:25–156:2). And there appears to be no dispute about that: Tenorio thought the move would be financially advantageous because of the lower cost of living in Portugal, including for children's activities and health insurance. (Trial Tr. (Tenorio) at 37:2–20).

19.    But Tenorio and Vieira dispute whether it was a temporary or permanent move. Vieira agreed she spoke with Tenorio in 2021 about going to Portugal, but Tenorio never said they "were going to move [there] permanently." (Trial Testimony of Ana Paula Nunes Vieira dated Apr. 22, 2025, ("Apr. 22 Trial Tr. (Vieira)"), at 187:14–16). Vieira claimed that she never told him she would move permanently, (Apr. 10 Trial Tr. (Vieira) at 134:25, 135:5–19); instead, she said that she would try a move and that Tenorio agreed to a trial relocation. (*Id.* at 171:9; Apr. 22 Trial Tr. (Vieira) at 189:1–10 ("Q: [Y]ou did know that it was [Tenorio's] intention to move the family to Portugal, correct? A: He wanted me to try."); *see* Trial Tr. (Humburger) at 204:18–20 ("Q: When

your mom went to Portugal in August of 2024, did she tell you what her intention was about staying there?  A: [S]he was trying to stay there[.]")).  Vieira testified that she told Tenorio that she did not want to live permanently in Portugal and that "[e]veryone was aware that [she] never wanted to live there."  (Apr. 10 Trial Tr. (Vieira) at 135:20–23).  She consistently took the position that the move was not to be permanent.  (*Id.* at 135:5– 11 ("Q: [W]ere you aware that your husband filed [papers] . . . to invest and move to Portugal?  A: Yes.  He told me that he was doing that because it was financially beneficial for him, but never to live there permanently."), 156:22–157:5 (testifying that Tenorio "never expressed vocally, verbally to [her] that [they] would have to live there.")).  Vieira credibly testified that the parties did not have an understanding about the length of time they were going to be in Portugal when they went there and that before they went, she told Tenorio that she did not want to move there.  (*Id.* at 137:1–5, 142:2–4).  She stated "[Tenorio's] idea was let's go there, so that when we are there, we can see and I can see and I can show you how you're going to adapt staying there.  But from the get-go, I already knew that I did not want to go there, that it was not the place where I wanted to stay."  (*Id.* at 137:4–9).  "What [Tenorio] wanted was for me to go and see firsthand what my experience would be there to try[.]"  (*Id.* at 169:23–25).

20.    Tenorio largely did not dispute this account, (*see* Trial Tr. (Tenorio) at 86:15–23, 96:1–11), but he did take steps—which Vieira joined—to establish a home and residence in Portugal, which, while perhaps not permanent, was more settled than a temporary sojourn or vacation.  These steps, described in detail below, included applying for and obtaining a "Golden Visa," purchasing and renovating a home in

Porto, helping Vieira's extended family members relocate to Porto from Brazil, and enrolling S.E.V.T. in a local private school.

21.     The Portuguese Golden Visa required applicants to make an investment of 350,000 euros in Portugal.  (Statement of Facts ¶ xi; Trial Tr. (Tenorio) at 34:5–8). Tenorio hired a lawyer, Bruno Pereirinha, to assist with the application process.  (Trial Tr. (Tenorio) at 33:14–18).  On September 29, 2021, Pereirinha explained to Tenorio that the program granted successful applicants temporary residency in Portugal, and citizenship could be requested after five years of residence.  (Email Correspondence Between Tenorio and Pereirinha dated Sept. 28, 2021, to Oct. 6, 2021, ("2021 Tenorio-Pereirinha Emails"), Pet'r's Ex. 6 at 3–4).  Tenorio—not Vieira (who was not on the email exchange)—replied "I have decided to proceed with the investment and program in the hope of obtaining [Portuguese] citizenship for my family."  (*Id.* at 3).  Pereirinha recommended that Tenorio apply for the Golden Visa individually and then proceed with obtaining Portuguese residency for Vieira and S.E.V.T. through a family reunification process.  (Trial Tr. (Tenorio) at 34:12–17; *see* Email Correspondence Between Tenorio and Pereirinha dated Oct. 22, 2024, to Nov. 11, 2024, ("2024 Tenorio-Pereirinha Emails"), Pet'r's Ex. 94 at 2–3).  Ultimately, on December 29, 2021, the Golden Visa application was submitted along with extensive documentation.  (Tenorio Golden Visa Application Materials, Pet'r's Ex. 23 (processing receipt at P000319)).  The application was in Tenorio's name alone.  (Trial Tr. (Tenorio) at 97:25–98:2).

22.     Vieira testified that she told Tenorio and Pereirinha in 2021 that she did not want anything to do with Portugal, (Apr. 10 Trial Tr. (Vieira) at 158:5–11), and that

she did not have any discussions with any lawyers in 2021 regarding the Golden Visa. (Apr. 22 Trial Tr. (Vieira) at 188:10–13). But on November 23, 2021, Vieira signed a Power of Attorney authorizing Pereirinha to, among other things, "represent [her] before the Immigration and Border Services . . . including powers to request or renew her Residence Permit for pursuing an investment activity in Portugal . . . through family reunion, requested by her husband, Paul Tenorio[.]" (Power of Attorney dated Nov. 23, 2021, Pet'r's Ex. 13 at 1–2). And Vieira admitted that she signed the Power of Attorney papers knowing that it was to permit Pereirinha to prepare the Golden Visa application. (Apr. 22 Trial Tr. (Vieira) at 189:11–17 ("Q: "[Y]ou knew that the purpose of that power of attorney was to allow the attorney in Portugal to proceed with the Golden Visa for your family, correct?  A: Yes.")).

23.     In November 2021, Tenorio contacted a real estate agent, Paula Amaral, to find an apartment in Portugal. (Trial Tr. (Tenorio) at 40:10–19, 41:10–11; Deposition of Maria Paula Brandao Barradas Amaral dated Apr. 23, 2025 ("Amaral Dep."), at 7:12–14, 8:16–18). Amaral showed Tenorio properties over the internet and sent a video of the apartment Tenorio and Vieira eventually decided to purchase. (Trial Tr. (Tenorio) at 41:18–20). Amaral's understanding was that Tenorio and Vieira "wanted to live in Portugal" and the apartment "was a property for them to live [in] as a family." (Amaral Dep. at 7:22–8:6).

24.     On December 6, 2021, Tenorio signed a contract for the purchase of an apartment in Porto. (Sale and Purchase Contract dated Dec. 6, 2021 ("Porto Apartment Contract"), Pet'r's Ex. 15; Trial Tr. (Tenorio) at 42:18–19). The contract was in Tenorio's

name alone, (Porto Apartment Contract), but Vieira's name and Portuguese Tax Identification Number are listed on the Portuguese Real Estate Registry.  (Certificate of Real Estate Registry dated Dec. 24, 2021, Pet'r's Ex. 18 at 1 (denoting Vieira as Tenorio's spouse)).

25.     Tenorio and Vieira also decided to purchase a house in Portugal.  (Trial Tr. (Tenorio) at 50:1–7).  In July 2023, Vieira traveled to Portugal by herself to select a home.  (Statement of Facts ¶ xxiv; Apr. 10 Trial Tr. (Vieira) at 141:16–19; Flight Confirmation dated July 12, 2023, Pet'r's Ex. 29).  Vieira, accompanied by her two nephews, spent approximately four days with real estate agent Alberto Augusto Liberal DaFonseca ("Liberal") looking at various houses.  (Deposition of Alberto Augusto Liberal DaFonseca dated Apr. 23, 2025 ("Liberal Dep."), at 6:17, 11:6–20, 11:24–12:7; WhatsApp Conversation Between Vieira and Liberal dated July 21, 2023, to July 25, 2023, ("Vieira-Liberal WhatsApp"), Pet'r's Ex. 27).  According to Liberal, at the time, Vieira "was quite excited to move to Portugal, for several reasons.  One of them she told me . . . was . . . she had a sister in the city, so she will be close to her sister.  She told me about open[ing] a restaurant or some store in the city."  (Liberal Dep. at 19:18–24).

26.     Vieira ultimately selected a house to purchase, (Statement of Facts ¶ xxv), a selection she made on her own.  (Apr. 22 Trial Tr. (Vieira) at 192:25–193:2 ("Q: And you, yourself, selected the home, is that correct?  A: Yes.")).  On July 31, 2023, both Tenorio and Vieira signed a Promissory Purchase and Sale Contract for the house in Portugal.  (Promissory Purchase and Sale Contract dated July 31, 2023, Pet'r's Ex. 30).

Tenorio and Vieira own the house in Portugal jointly and are both listed as owners on the city registry.  (Urban Property Register dated Feb. 12, 2024, Pet'r's Ex. 61).

27.    Vieira testified that she did not tell anyone that she wanted the house in Portugal to be for her family or that she wanted to live there.  (Apr. 10 Trial Tr. (Vieira) at 161:16–21).  To that end, she claimed she went to Portugal to select a house as "another one of [Tenorio's] investments," like the properties he owns in the United States, Ecuador, and Brazil.  (*Id.* at 159:15–21; Apr. 22 Trial Tr. (Vieira) at 192:9–13 ("It was another investment like he wanted, like the one he has in Ecuador or in Brazil")).  Vieira had previously selected two of Tenorio's investment properties in Ecuador, an apartment and a house; she went with Tenorio to Ecuador to select those properties.  (Apr. 10 Trial Tr. (Vieira) at 159:22–160:4).

28.    This account is not credible.  Vieira admitted on cross-examination that she intended to renovate the house for her family to live there.  (Apr. 22 Trial Tr. (Vieira) at 193:13–20 ("Q: With respect to the home [in Portugal], it was your intention to renovate the home.  Correct?  A: Yes.  Q: And it was to be renovated in order to accommodate your family . . . [i]s that correct?  A: The house had to be renovated.")).  The renovations included design features for her family specific to their young, school-aged children.  *See* FOF ¶¶ 9, 31.  Her contemporaneous actions and words reveal that she intended the house to be one where she would live with Tenorio and S.E.V.T.  For example, Liberal spoke with Vieira about her goals for her family's life in Portugal.  (Liberal Dep. at 16:8–15, 19:10–14).  To that end, Liberal observed that Vieira "was quite excited to move to Portugal[.]"  (*Id.* at 19:18–19).

29.      Conversations with the family's architect reveal similar intentions.  On August 8, 2023, Pedro Ferreira Architect Studio emailed Tenorio with a proposal for home renovations.  (Email Correspondence Between Pedro Ferreira Architecture Studio and Tenorio dated July 23, 2023, to Aug. 9, 2023, Pet'r's Ex. 28 at 2).  Tenorio signed the proposal, which named both Tenorio and Vieira as clients.  (Fee Proposal from Paul Ferreira Architect Studio, Pet'r's Ex. 31 at 2, 15).  Both Tenorio and Vieira signed a Declaration of Authorization permitting renovations to proceed on the house. (Declaration of Authorization dated Oct. 2023, Pet'r's Ex. 38).

30.      Thereafter, Tenorio and Vieira worked with architect Marta Silva on the project.  (Deposition of Marta Silva dated Apr. 17, 2025 ("Silva Dep."), at 6:12, 16:9–20). Vieira spoke and met with Silva several times in 2023.  (Apr. 22 Trial Tr. (Vieira) at 193:22–194:11).  It was Silva's understanding that the parties "wanted to move to Portugal and to live [there]."  (Silva Dep. at 25:17–22, 18:19–19:2 ("[T]he house was for Ana, Paul.  Ana, Paul, and then the little kids.")).

31.      According to Silva, Vieira and Tenorio's "major priority [regarding the house] was to do a project where they could feel at home, but also in a very short time. . . . [T]hey wanted to move to [Porto] for . . . their kids [to] start the school in September." (Silva Dep. at 13:10–22; *see also id.* at 23:9–24:3 ("[Vieira] shared with us that she really loves that part of the city, the weather, the people are very friendly, and she was very—my perception was that she was very excited with this process, with this change to Portugal, especially because of his—her son.")).  Vieira requested specific alterations to accommodate her and Tenorio, with common spaces to socialize, eat,

work, and supervise the children's homework.  (*Id.* at 11:11–12:6; Deposition of Pietro Vasconcelos dated Apr. 18, 2025 ("Vasconcelos Dep."), at 12:8–16; 15:14–16:2).

32.     The design process was completed by the end of 2023.  (Trial Tr. (Tenorio) at 51:17–18).  The parties then hired contractor Pietro Josue Baptista Vasconcelos ("Vasconcelos").  (*Id.* at 51:13–15, 52:19; Vasconcelos Dep. at 7:3–6, 7:18–19; Construction Contract dated Apr. 29, 2024, and Email Enclosing Contract dated Apr. 29, 2024 ("Construction Contract and Email"), Pet'r's Ex. 52; Vasconcelos Construction Invoice dated Apr. 29, 2024 ("Construction Invoice"), Pet'r's Ex. 53).  Vasconcelos said that the renovation process would take several months to complete.  (Statement of Facts ¶ xxvii).  As such, the family planned to temporarily reside in the apartment they had purchased in 2021, pending completion of the renovation.  (*Id.* ¶ xxviii).  Vasconcelos said the "house was a high priority" for Vieira, who hoped construction would be complete by the end of the 2024-2025 school term so that she and S.E.V.T. could move in.  (Vasconcelos Dep. at 28:24–29:8).  Vasconcelos understood from his conversations with Tenorio and Vieira that their plan was to move to Portugal "permanently."  (*Id.* at 28:19–24).  Diana Vasconcelos, Vasconcelos's wife, believed that Vieira "always wanted to stay in Portugal."  (Deposition of Diana Vasconcelos dated Apr. 18, 2025 ("D. Vasconcelos Dep."), at 7:23–8:8).

33.     In addition to the property purchases and home renovation, the parties undertook other actions in anticipation of moving to Portugal, including enrolling S.E.V.T. in school.  Vieira completed applications for both her sons—S.E.V.T. and P.A.— to attend school in Portugal.  (Apr. 22 Trial Tr. (Vieira) at 197:24–198:2 ("Q: In

connection with the move to Portugal, you made an application for your sons to go to school in Portugal, correct?  A: Yes. . . . Q: [I]n fact, a year before you moved?  A: Correct.")).

34.     S.E.V.T. and P.A. were accepted to an international school called CLIP, (Trial Tr. (Tenorio) at 55:19–56:2), and S.E.V.T. was enrolled in kindergarten for the 2024-2025 school year.  (Statement of Facts ¶ xxix).  Both Tenorio and Vieira signed S.E.V.T.'s acceptance form.  (CLIP Acceptance Letter and Form dated Nov. 20, 2024, Pet'r's Ex. 41).  S.E.V.T. was unenrolled from the Little Saints preschool—located in West Hempstead, New York—in around June 2024.  (Apr. 10 Trial Tr. (Vieira) at 149:10–12; Letter from Little Saints dated Mar. 7, 2025, Resp't's Ex. 22).

35.     Tenorio also obtained Portuguese medical insurance for himself, Vieira, and S.E.V.T.  (Statement of Facts ¶ xxx; Medis Insurance Policy dated Mar. 21, 2024, Pet'r's Ex. 50 at 16;[3] Trial Tr. (Tenorio) at 56:6–9).  And Tenorio purchased a car in Portugal for the family to use.  (Trial Tr. (Tenorio) at 56:13–14; *see* Apr. 10 Trial Tr. (Vieira) at 143:13–17).

36.     In June 2024, Tenorio put his Garden City house on the market, with the plan of using the sale proceeds to finance the renovation of the Portugal house.  (Trial Tr. (Tenorio) at 53:18–25).  The house was sold on August 19, 2024.  (Statement of Facts ¶ xxxi; Statement of Closing dated Aug. 19, 2024, Pet'r's Ex. 62).  Tenorio used the proceeds to fund his investments in Portugal.  (*See* Email Correspondence Between Tenorio and DiPaolo dated Aug. 3, 2024, to Sept. 15, 2024, Pet'r's Ex. 55).

---

[3] This page number reflects the pagination of the PDF.

37.     In June 2024, the family moved into a house located in Franklin Square, New York.  (*See* Trial Tr. (Apr. 10 Vieira) at 137:10–14, 138:17–20; Trial Tr. (Tenorio) at 53:3).  Brenda also moved into this house.  (Trial Tr. (Humburger) at 202:8–15).  A "top to bottom" renovation of this new house was then conducted.  (Trial Tr. (Tenorio) at 89:17–24; Apr. 10 Trial Tr. (Vieira) at 137:22–23, 138:13–20; Photos and Videos of Franklin Square Renovation, Resp't's Ex. 25).  Tenorio and Vieira did not sell the Franklin Square house prior to moving to Portugal in August.  (Trial Tr. (Tenorio) at 89:17–90:7).

38.     Brenda was living at the Franklin Square house when Tenorio and Vieira left for Portugal, (Trial Tr. (Tenorio) at 90:8–10), and she continues to reside there.  (Trial Tr. (Humburger) at 206:17–18).  Tenorio's intention was to rent the house, but keep the basement apartment for when he had to travel back to the U.S. for business.  (Trial Tr. (Tenorio) at 54:1–7, 93:9–21).  Tenorio said that he believed he would eventually have to sell the house.  (*Id.* at 54:7–9).

39.     Tenorio and Vieira kept two vehicles at the Franklin Square house after they went to Portugal.  (Trial Tr. (Tenorio) at 90:12–13; Apr. 10 Trial Tr. (Vieira) at 140:22–141:5; Photos of Vehicles Outside Franklin Square House, Resp't's Ex. 4).  The vehicles remain registered and insured in the U.S.  (Trial Tr. (Tenorio) at 90:11–16; Apr. 10 Trial Tr. (Vieira) at 141:6–9).  They also left personal property in the house.  (Apr. 10 Trial Tr. (Vieira) at 140:10–15 ("We took about seven luggages [sic] when we went to Portugal with everything, clothes, shoes, but when we left the house, the house had everything inside[.]")).

40.     Tenorio also owns two houses in Florida, one his sister lives in and one he rents out, and several properties in Ecuador.  (Trial Tr. (Tenorio) at 54:17–23, 55:4–5, 91:16–92:4).  Tenorio did not sell these properties when the family went to Portugal.  (*Id.* at 90:20–25, 91:5–8, 91:16–92:4).  Tenorio also maintained his U.S. bank accounts and U.S. health insurance after moving to Portugal.  (*Id.* at 90:17–19, 92:9–93:6).

41.     Tenorio took steps to wind down his business in New York.  He owns a construction business in New York named PETK, Inc., which has an office in Hempstead.  (Trial Tr. (Tenorio) at 11:5–20, 14:6–12).  Tenorio testified that PETK, Inc. is not currently taking on new work and is solely involved in the completion of two pending contracts "from two years ago."  (*Id.* at 14:13–25, 88:15–17).  Vieira acknowledged this wind-down, stating: Tenorio "has two projects that he has to execute . . . there's two projects that he has to finish."  (Apr. 10 Trial Tr. (Vieira) at 142:17–24 ("I didn't really understand much, but [Tenorio] had these two projects because he's constantly in competition with other companies, but there are these two new projects that he has to now finish—to start.")).

42.     On August 10, 2024, Tenorio purchased one-way airline tickets for himself, Vieira, S.E.V.T., and P.A. to fly from New York to Porto.  (Flight Confirmation dated Aug. 10, 2024, Pet'r's Ex. 57).  They took these flights the next day.  (*See* Boarding Passes dated Aug. 11, 2024, Pet'r's Ex. 58; Apr. 10 Trial Tr. (Vieira) at 136:12–14).  Vieira acknowledged that when she got on the airplane to go to Portugal, she did not think it was for a vacation.  (*Id.* at 169:17–23).  S.E.V.T. was four-and-a-half years old at the time. (Trial Tr. (Tenorio) at 99:9–11).

43.     Vieira testified that she took this flight to Portugal with Tenorio and her children because she was "fearful."  (Apr. 10 Trial Tr. (Vieira) at 136:12–16).  She said, "Before I moved, before we went, [Tenorio] said, you are not going to stay in the [Franklin Square] house. . . .  So you will either come to Portugal or be in the street." (*Id.* at 136:2–5).  Tenorio told her "multiple times that if [she] was to ever decide to stay [in the United States] and not go with him, he wasn't going to give [her] any[] [financial support]."  (*Id.* at 166:24–167:3).  The Court finds this testimony credible, despite Tenorio's contrary version of events.  (*See* Trial Tr. (Tenorio) at 95:12–14).  Indeed, Tenorio admitted that in the last two weeks before the parties went to Portugal, "[Vieira] objected . . . once or twice," (*id.* at 96:9–11), and that in the course of a fight during that two-week period, he told Vieira that she could not live in the Franklin Square house if she did not go to Portugal.  (*Id.* at 95:22–96:8).

44.     Vieira's account of leaving for Portugal in August 2024, over her objection and as a result of her economic dependency on Tenorio, was corroborated by her daughter, Brenda, and friend, Karol Puccio.  Brenda testified that Vieira "never wanted to go [to Portugal], but she [had] no choice . . . .[b]ecause [Tenorio] told her if she didn't want to go he wouldn't let her live in the house."  (Trial Tr. (Humburger) at 204:1–9). Puccio, a friend of Vieira's and neighbor from when the family lived in New York, testified that Vieira told her that Tenorio "had decided to move to Portugal" but that Vieira "was never happy about going."  (Trial Testimony of Karol Puccio dated Apr. 22, 2025, ("Trial Tr. (Puccio)"), at 213:20–214:2, 215:4–8).

45.     After their arrival in Portugal, on September 6, 2024, Vieira signed a registration form for S.E.V.T.'s enrollment at CLIP for the 2024-2025 academic year. (CLIP Enrollment Form dated Sept. 6, 2024, Pet'r's Ex. 75; Trial Tr. (Tenorio) at 114:22–25 ("Q: [Vieira] signed a contract in Portugal for the next school year, and indicated that the kids would be present for the next school year?  A: Yes.")).  S.E.V.T. was enrolled in CLIP for the 2024-2025 academic year.  (CLIP Enrollment Declaration dated Feb. 10, 2025, Pet'r's Ex. 79 at 1).  The Autumn Term at CLIP commenced on September 9, 2024. (*Id.*).

46.     It is plain that Vieira was unhappy in Portugal, and Tenorio offered no evidence to the contrary.  Once they arrived in Portugal, Vieira was upset by the family's living situation—their house was not yet completed.  She stated: "When I arrived in Portugal to the location where we went [the Porto apartment], . . . I didn't like it.  I didn't want to stay there."  (Apr. 10 Trial Tr. (Vieira) at 170:5–7; *see also id.* at 170:16–19 ("Way before we ever went [to Portugal], I once mentioned to [Tenorio] [that] perhaps it would have been best if we moved into our home; however, we arrived there, and we arrived at an apartment and everything was awful.")).  Vasconcelos confirmed Vieira's displeasure with the apartment, noting Vieira had "anxiety in adapting to the apartment."  (Vasconcelos Dep. at 25:21–22, 29:3–4).  "Ana had come from a large house in the United States and went into a small apartment while the house was being prepared."  (*Id.* at 25:22–25).

47.     Vieira expressed her unhappiness to Tenorio.  She testified: "I cried every day.  It was awful.  I begged [Tenorio] and I told him all the time there, let's go back

home.  This isn't our home.  I'm not happy here."  (Apr. 10 Trial Tr. (Vieira) at 145:6–8).

Tenorio acknowledged that Vieira was unhappy in Portugal.  (Trial Tr. (Tenorio) at

105:14–18 ("Q: [Y]ou told us that your wife was unhappy in Portugal, right?  A: Yes.")).

Brenda also testified that Vieira "would call [her] almost every day crying and the kids

[were] crying too and she was having fights with [Tenorio].  They [were] just not

happy."  (Trial Tr. (Humburger) at 205:10–16).  Puccio explained that Vieira was

"miserable" in Portugal: "Every time we talk[ed] on the phone she was crying.  She

didn't like Portugal.  She hate[d] the weather.  She didn't like the people.  She was very

unhappy."  (Trial Tr. (Puccio) at 216:15–20).

48.     Notwithstanding her unhappiness, Vieira told Tenorio that she "would

try" to stay but testified that Tenorio "knew that [she] wanted to move back to the

United States."  (Apr. 10 Trial Tr. (Vieira) at 171:4–9; Apr. 22 Trial Tr. (Vieira) at 198:20–

21, 199:2–3).  Brenda also testified that when Vieira went to Portugal in August 2024,

her intent was to "try[] to stay there" but the parties were "just fighting."  (Trial Tr.

(Humburger) at 204:18–21).

49.     Tenorio testified—though he was not credible in the Court's view—that

Vieira committed to staying until mid-2025.  He claimed that Vieira said, "I'm going to

stay for the year[,] . . . finish the school with the kids, and see how the house comes out.

That might change my views."  (Trial Tr. (Tenorio) at 63:12–24).  According to Tenorio,

Vieira repeated this sentiment several times during the beginning of the family's stay in

Portugal—around September through November of 2024—and in reference to the 2024-

2025 academic year.  (*Id.* at 64:9–65:5).  But neither Vieira nor any other witness

corroborated this.  Ultimately, the dispute does not affect the Court's resolution.  But regardless of whether Vieira agreed to stay until mid-2025, it is plain that Tenorio knew she was unhappy from the outset of their move to Portugal.

50.    Notwithstanding Vieira's unhappiness, she and Tenorio continued to take steps to adjust to a more permanent life in Portugal.  In October 2024, Tenorio was notified that his application for Permanent Residency had been approved and he received a copy of his Portuguese Residence Permit.  (*See* Portuguese Residence Permit and Letter, Petr's Ex. 96).  Tenorio then completed the Portuguese Agency for Integration, Migration, and Asylum ("AIMA") Family Reunification Petition and Responsibility Statements for Vieira and S.E.V.T.  (Family Reunification Petition, Pet'r's Ex. 98; AIMA Responsibility Statement, Pet'r's Ex. 99; Screenshots from AIMA dated Nov. 5, 2024, Pet'r's Ex. 101; 2024 Tenorio-Pereirinha Emails, Pet'r's Ex. 94 at 1–2).  On October 23, 2024, Pereirinha emailed Tenorio about documents for the family reunification requests.  (2024 Tenorio-Pereirinha Emails, Pet'r's Ex. 94 at 2).  On October 24, 2024, Tenorio replied to Pereirinha with the required documentation and requested to include P.A. in the family reunification process.  (*Id*.).

51.    Shortly thereafter, the parties submitted family reunification applications for Vieira and S.E.V.T., which remain pending.  (Screenshot from AIMA Regarding S.E.V.T.'s Application, Pet'r's Ex. 102; Payment for Vieira's Residence Permit dated Nov. 5, 2024, Pet'r's Ex. 103).  The application for Vieira was submitted on November 5, 2024.  (Vieira Residence Permit Application dated Nov. 5, 2024, Pet'r's Ex. 22).

52.    In November 2024, Tenorio opened VASTEN Construções & Emprendimentos, LDA, a construction business in Portugal, with Vasconcelos. (Statement of Facts ¶ xxxix; Trial Tr. (Tenorio) at 15:2–15, 57:1–2; Contract Regarding VASTEN Construções & Emprendimentos, LDA dated Nov. 28, 2024, Pet'r's Ex. 69). On November 23, 2024, Tenorio accepted a job as manager of the company. (Acceptance Letter dated Nov. 23, 2024, Pet'r's Ex. 107).

53.    Tenorio and Vieira developed a close friendship with the Vasconcelos family. (Trial Tr. (Tenorio) at 56:15–25; Apr. 22 Trial Tr. (Vieira) at 199:9–11). Vieira socialized with them regularly. (Apr. 22 Trial Tr. (Vieira) at 199:9–16; D. Vasconcelos Dep. at 7:4–16). The Vasconcelos's have three children, including their son, K.V., who was six years old when he met S.E.V.T. (Vasconcelos Dep. at 21:19–20, 21:25, 22:19–21). S.E.V.T. and K.V. became good friends and played together regularly. (*Id*. at 22:5–8, 23:13–17; D. Vasconcelos Dep. at 8:13–19; Trial Tr. (Tenorio) at 57:9–13, 77:11–24; *see* Photos and Videos of S.E.V.T., Pet'r's Ex. 129). The two families took several trips together around Portugal, including to Santa Maria de Feira. (Trial Tr. (Tenorio) at 77:24–78:14, 82:9-15; Photos and Videos of S.E.V.T., Pet'r's Ex. 129 at P_000513-515, P-000521). The families also took a trip to Disneyland Paris with their children, including S.E.V.T., and Vieira's sisters. (Trial Tr. (Tenorio) at 60:6–9, 83:6–10; Photos and Videos of S.E.V.T., Pet'r's Ex. 129 at P_000523, P_000525-526).

54.    S.E.V.T. has extended family in Portugal, including his maternal aunts and cousins with whom he spent significant time. (Statement of Facts ¶ xxxii). Vieira's sisters, Viviane and Luciane Nunes, relocated from Brazil to Portugal (in 2022 and 2023,

respectively) before Tenorio and Vieira moved there in August 2024.  (Statement of Facts ¶¶ xiii- xxii; Trial Tr. (Tenorio) at 38:12–22).  This came about because, following a discussion with Vieira, Tenorio suggested that her sisters move to Portugal as an opportunity for them to improve their living situations.  (Trial Tr. (Tenorio) at 38:23–25, 39:6–15).  Tenorio offered to help them move and they accepted his assistance.  (Statement of Facts ¶ xix; Trial Tr. (Tenorio) at 39:6–20; Apr. 22 Trial Tr. (Vieira) at 191:2–8).  Tenorio purchased one-way plane tickets for Vieira's sisters and their children to move from Brazil to Portugal.  (Statement of Facts ¶ xx; Trial Tr. (Tenorio) at 39:16–18; Apr. 22 Trial Tr. (Vieira) at 191:15–18).

55.    In August 2022, Luciane Vieira relocated to Portugal with her child and moved into the apartment that Tenorio purchased in 2021.  (Statement of Facts ¶ xxi; Apr. 10 Trial Tr. (Vieira) at 163:23–24).  In August 2023, Viviane Vieira also moved with her children to that apartment.  (Statement of Facts ¶ xxii).  Vieira's sisters resided in the apartment until August 2024.  (*Id*. ¶ xxiii).  As a result of the relocation of his aunts, S.E.V.T. was able to spend time with his cousins (the sons of Vieira's sisters), with whom he became close.  (Photos and Videos of S.E.V.T., Pet'r's Ex. 129 at P_000528 and Video Part 1; Trial Tr. (Tenorio) at 83:15–16, 84:5–6).  Vieira's sisters currently reside together in an apartment in Porto and hold jobs in Portugal.  (Apr. 22 Trial Tr. (Vieira) at 191:23–192:5).

56.    In September 2024, S.E.V.T. began attending school at CLIP.  (Statement of Facts ¶ xxxvi).  Tenorio testified that S.E.V.T. appeared happy in school and the teachers at CLIP loved him.  (Trial Tr. (Tenorio) at 58:14–20).  Vieira disagreed,

testifying that S.E.V.T. "never adapted" to Portugal and that he had a difficult time adjusting to CLIP.  (Apr. 10 Trial Tr. (Vieira) at 144:7–16).  But S.E.V.T.'s school reports suggest positive progress and quick adjustment.  In an email dated October 8, 2024, S.E.V.T.'s teacher reported that, although S.E.V.T. "initially faced some challenges adjusting to his new environment," he is now "happy to attend school and has gradually begun to form friendships."  (Email from Ferreira to Tenorio dated Oct. 8, 2024, Resp't's Ex. 7).  S.E.V.T.'s teacher further wrote that she believes S.E.V.T. "is on the right path."  (*Id.*).  In a comment to S.E.V.T.'s Autumn 2024 Progress Report, the school wrote: "A positive first set of reports.  [S.E.V.T.] is settled and is developing his understanding of the expectations in his new setting."  (CLIP Autumn 2024 Progress Report, Pet'r's Ex. 124 (Resp't's Ex. 8) at P000574).

57.    S.E.V.T. participated in various activities that CLIP had to offer, including camp, special programs, and field trips around Portugal.  (Trial Tr. (Tenorio) at 59:19–24, 60:3–5).  S.E.V.T. also visited numerous cultural destinations throughout Portugal, including to watch a performance of the Nutcracker.  (Email from Rego to Tenorio dated Oct. 8, 2024, Pet'r's Ex. 87; Email from Ferreira to Tenorio dated Oct. 15, 2024, Pet'r's Ex. 92; Email from Rego to Tenorio dated Oct. 23, 2024, Pet'r's Ex. 95).

58.    S.E.V.T. received medical treatment in Portugal.  (Statement of Facts ¶ xxxiii).  He was seen by doctors as well as dentists, who noted that he had moved from the United States.  (*Id.* ¶ xxxiv; Medical Records dated Aug. 21, 2024, and Nov. 26, 2024, Pet'r's Ex. 65 ("Appointment Reason: Routine.  They have resided in the U.S. since birth until now.  In process of moving to [Portugal][.]")).

59.     Tenorio believed that S.E.V.T. was happy while residing in Portugal. (Trial Tr. (Tenorio) at 75:20–23).  Vasconcelos described S.E.V.T.'s demeanor in Portugal as "very happy" and stated that S.E.V.T. and K.V. were "very happy together." (Vasconcelos Dep. at 29:16–23).  Vieira explained S.E.V.T.'s happy demeanor as a child's misapprehension about why they were in Portugal: "S.E.V.T. is a happy kid; however, he's happier [in the U.S.].  In his head . . . going [to Portugal] was simply going for a vacation at my sisters' house.  He doesn't understand Portugal. . . .  Here is his home and he knows that."  (Apr. 10 Trial Tr. (Vieira) at 150:24–151:4).

60.     On December 10, 2024, Tenorio traveled to New York to close out the end of the business year for his U.S. company.  (Trial Tr. (Tenorio) at 68:5-16).  Around the same time, Tenorio began getting estimates to move the family's personal property from the Franklin Square house to Portugal.  (Trial Tr. (Tenorio) at 105:23–106:4; Moving Estimate dated Dec. 18, 2024, Pet'r's Ex. 56).  On December 19, 2024, Brenda told Vieira that Tenorio "had hired a container to bring [their] stuff over" to Portugal. (Apr. 10 Trial Tr. (Vieira) at 146:10–12).  Brenda saw a slip of paper at the house that "mentioned a hired container," (*id.* at 146:13–19), which she understood was an estimate to move the family's personal possessions to a New Jersey storage location, not Portugal.  (Trial Tr. (Humburger) at 205:19–206:3, 209:13–19).  Brenda called the moving company to ask whether they had been hired to go to Portugal, and they told her no, because they do not do international moves.  (*Id.* at 210:2–7).  Brenda and Vieira interpreted this action—of removing their belongings from the New York residence without their involvement—as a coercive attempt by Tenorio to force them out of New

York and into a permanent move to Portugal.  (Apr. 10 Trial Tr. (Vieira) at 146:10–147:9; *see* Trial Tr. (Humburger) at 205:19–206:11).

61.    Tenorio had previously proposed to Vieira that the family spend Christmas 2024 in Ecuador with his mother.  (Trial Tr. (Tenorio) at 61:21–24).  Vieira told Tenorio that she did not want to go there for Christmas because Brenda was planning to visit Portugal on December 28, 2024.  (*Id.* at 62:2–3).  Tenorio and Vieira therefore agreed to meet in Ecuador for the New Year's holiday to be together as a family and give Tenorio's mother a chance to see her grandson.  (*Id.* at 69:25–70:14; Statement of Facts ¶ xli).  Around this time, Brenda told Tenorio she had purchased a plane ticket and was ready to go to Portugal, (Trial Tr. (Tenorio) at 62:11–22), and the family agreed that Vieira would travel with S.E.V.T. to Ecuador on December 30.  (*Id.* at 70:21–25; Statement of Facts ¶ xlii; Flight Itinerary for Vieira and S.E.V.T. dated Nov. 22, 2024, Pet'r's Ex. 123).

62.    On December 22nd, Tenorio traveled to Ecuador to visit his mother. (Statement of Facts ¶ xl).  On December 21st, Vieira informed Tenorio via WhatsApp that she was planning to travel with S.E.V.T. to Vigo, Spain.  (Statement of Facts ¶ xliii; Trial Tr. (Tenorio) at 71:10–14; WhatsApp Conversation between Vieira and Tenorio dated Dec. 11, 2024, to Feb. 9, 2025 ("Vieira-Tenorio WhatsApp"), Pet'r's Ex. 116 at 1). Vieira told Tenorio that she wanted to go to Vigo to see the Christmas decorations and that she would go with her sisters and their children.  (Trial Tr. (Tenorio) at 71:20–25).

63.    Vieira never went to Spain.  (Statement of Facts ¶ xliv; Trial Tr. (Tenorio) at 72:16-20), nor had she ever intended to go there.  (Statement of Facts ¶ xlv; Apr. 10

Trial Tr. (Vieira) at 147:10–15). Vieira believed it necessary to deceive Tenorio about her plans because "he wouldn't accept anything I said. He didn't want to hear me," (*id*. at 147:18–24)—presumably a reference to her unhappiness in Portugal.

64. On December 21st, 2024, the same day she told Tenorio she was going to Spain, Vieira flew with S.E.V.T. to New York, without informing Tenorio. (Statement of Facts ¶ xlvii; Trial Tr. (Tenorio) at 72:21–73:5; Apr. 10 Trial Tr. (Vieira) at 148:17–21). Tenorio did not learn that Vieira had traveled to New York with S.E.V.T. until after he arrived in Ecuador on December 22nd. (Trial Tr. (Tenorio) at 73:6–10; Vieira-Tenorio WhatsApp at 2). Vieira informed Tenorio of her whereabouts after she landed in New York, stating only "[w]e arrived[.]" (Vieira-Tenorio WhatsApp at 2).

65. On December 23rd, 2024, Vieira informed Tenorio that she was not planning on meeting him in Ecuador with S.E.V.T. at any point; she thereafter refused to return S.E.V.T. to Portugal, stating it was her intention to remain in the U.S. with him. (Statement of Facts ¶ xlix; Trial Tr. (Tenorio) at 73:13–23). Vieira also informed Tenorio via WhatsApp that she would not return to Portugal. (Trial Tr. (Tenorio) at 74:4–9; Vieira-Tenorio WhatsApp at 2–3).

66. S.E.V.T. currently resides in the Franklin Square house with Vieira, Brenda, and P.A. (Trial Tr. (Humburger) at 206:17–22). S.E.V.T. is enrolled in Little Saints, a preschool in New York. (Apr. 10 Trial Tr. (Vieira) at 149:5–11; Trial Tr. (Tenorio) at 108:8–10). Tenorio also resided at the Franklin Square house after returning to New York in February 2025; he remained there for approximately a week-and-a-half, but otherwise continued to reside in New York throughout the trial. (*See* Trial Tr.

(Tenorio) at 106:12–107:3; Transcript of Scheduling Conference dated February 19, 2025

("Feb. 19 Conference Tr."), at 4:20–25, 5:6–8.

## CONCLUSIONS OF LAW

1.      The Hague Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access[.]"  Hague Convention, pmbl.  "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken."  *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (quotations, citation, and alterations omitted).

2.      The United States and Portugal are both signatories to the Convention. Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 [https://perma.cc/GCD3-QXSK] (last visited July 7, 2025).  The Convention is implemented in the United States by ICARA, 22 U.S.C. §§ 9001 *et seq.*[4]  "ICARA is designed to 'establish procedures for the implementation of the Convention in the United States.'"  *Ozaltin v. Ozaltin*, 708 F.3d 355, 360 (2d Cir. 2013) (quoting 42 U.S.C. § 11601(b)(1)).  "The statute further clarifies that its provisions 'are in addition to and not in lieu of the provisions of the Convention.'"  *Id.* (quoting 42 U.S.C. § 11601(b)(2)).

---

[4] The provisions of ICARA were transferred from 42 U.S.C. §§ 11601 *et seq.* to 22 U.S.C. § 9001 *et seq.* in 2014.  This opinion cites to the Title 42 provisions when quoting cases that did so; otherwise, citations to the provisions in Title 22 are provided.  The transfer did not substantively alter the provisions of ICARA.

3. The "core premise" of the Convention is that "'the interest of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Convention, pmbl.). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id.* (citing Convention, art. 12). "Upon the child's return, the custody adjudication will proceed in that forum." *Id.* As such, "[t]he Convention does not establish substantive standards for resolving the merits of any underlying custody dispute. Rather, the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota*, 692 F.3d at 112 (citation omitted); *see also Monasky*, 589 U.S. at 72 ("The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings."); *Ozaltin*, 708 F.3d at 360 ("The court is limited to adjudicating 'only rights under the Convention' and may not decide 'the merits of any underlying child custody claims.'" (quoting 42 U.S.C. § 11601(b)(4))).[5]

4. "[T]he party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained[.]" *Golan v. Saada*, 596 U.S. 666, 671 (2022) (citing 22 U.S.C. § 9003(e)(1)).

---

[5] "While the Convention is designed, in part, to ensure the prompt return of children wrongfully removed or retained from their country of habitual residence by one parent, it also protects children who, though so removed or retained, face a real and grave risk of harm upon return." *Ermini v. Vittori*, 758 F.3d 153, 156 (2d Cir. 2014). Vieira has not asserted this affirmative defense to return. (Feb. 19 Conference Tr. at 6:21–25 ("Q: Does the respondent intend to raise any affirmative defense? . . . [O]ne of the grave risk affirmative defenses? A: No."); Answer dated Mar. 4, 2025, Dkt. No. 16).

> Under the Convention, removal or retention of a child is deemed 'wrongful' when: [1] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and [2] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Ermini*, 758 F.3d at 161 (quoting Hague Convention, art. 3).

5.      To prevail, the petitioner must show the following: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Tereshchenko v. Karimi*, 102 F.4th 111, 127 (2d Cir. 2024) (citing *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005)); 22 U.S.C. § 9003(e)(1)(A).

6.      The first element, habitual residence, is not defined in the Convention. *Monasky*, 589 U.S. at 76.  That said, habitual residence is understood as "[t]he place where a child is at home, at the time of removal or retention[.]"  *Id.* at 77.  "What makes a child's residence 'habitual' is therefore 'some degree of integration by the child in a social and family environment.'"  *Id.*  A child's "residence in a particular country can be deemed 'habitual' . . . only when her residence there is more than transitory."  *Id.* at 76.  A residence need not be permanent—"a habitual residence may be established *even when* a move is for a limited period and indeed indefinite."  *Ermini*, 758 F.3d at 162 (quotations omitted; emphasis in original).  Ultimately, in the end, habitual residence is

the place where a "child is at home," in a "social and family environment." *Monasky*, 589 U.S. at 77 (quotations omitted).

7.    "Because children, especially those too young . . . to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant[.]" *Id.* at 78.  But determining a child's habitual residence does not depend "on an actual agreement between a child's parents" on where they and the child are to reside.  *Id.* at 77.  "[A] wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether a[] [child's] residence in that place has the quality of being 'habitual.'"  *Id.* at 81.  It is a totality of circumstances, fact-intensive inquiry; "[n]o single fact . . . is dispositive across all cases."  *Id.* at 71, 78–79; *see also Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) ("Physical presence in a country is not a dispositive indicator of an infant's habitual residence.").

8.    Factors relevant to habitual residence include "where a child has lived, the length of time there, acclimatization, and the 'purposes and intentions of the parents.'" *Grano*, 821 F. App'x at 27 (quoting *Monasky*, 589 U.S. at 79).  Also relevant are: "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings."  *Monasky*, 589 U.S. at 78 n.3 (citing

Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)).[6]

9.      A factor that has particular import in this case is parental coercion, *i.e.*, where one parent is forced into moving and establishing a new habitual residence of a very minor child by the other parent.  Such coercion could preclude a finding that a child's new country was his habitual residence.  *Monasky*, 589 U.S. at 78 ("[S]uppose . . . an infant lived in a country only because a caregiving parent had been coerced into remaining there.  Those circumstances should figure in the calculus."); *Nisbet v. Bridger*, 124 F.4th 577, 589 n. 23 (9th Cir. 2024) ("Whether a caregiving parent is coerced into living in a country is relevant to courts' habitual-residence determinations." (citing *Monasky*, 589 U.S. at 78)).  "Courts recognizing coercion have identified factors such as serious intimate partner violence, concealment of the purpose of a visit, and restraint of the movement of the other parent by confiscation of passports."  *Ciampa v. Nichols*, No. 24-CV-2556, 2025 WL 521009, at *15 (C.D. Cal. Feb. 18, 2025).

---

[6] "That list has been updated to include 'the circumstances of caregiving parents with infants or young children,' 'indefinite residence in only one place,' 'the degree of the child's acclimatization to the new environment,' 'participation in religious activities,' 'parental intent,' 'the period of time that the child was physically located in a particular place, 'personal issues, such as medical care and schooling,' and 'previous stays in other countries.'"  *Nolla v. Vargas,* No. 22-CV-1224, 2024 WL 2976749, at *18 (E.D. Wis. June 13, 2024) (quoting Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 76-77 (3d ed. 2023)), *appeal dismissed*, No. 24-2177, 2024 WL 5305116 (7th Cir. Aug. 21, 2024).

10.     Through years of discussions and planning, Tenorio and Vieira had the purpose and intent of building a life in Portugal for their family.  Though they may not have agreed to move to Portugal permanently, the totality of circumstances demonstrate that Tenorio and Vieira set out to establish a home and residence in Portugal; took steps to scale back their ties to New York; and built a life for S.E.V.T. in Portugal: they enrolled him in school, where he participated in extracurricular activities; and arranged trips and excursions throughout the surrounding area, where he spent time with new friends and family.  Ultimately, and despite Vieira's unhappiness and the economic threats made by Tenorio, these facts demonstrate that Portugal was S.E.V.T.'s habitual residence in December 2024.

11.     Given S.E.V.T.'s very young age, Tenorio and Vieira's actions and intentions are probative of his habitual residence.  *Monasky*, 589 U.S. at 78.  The following demonstrates that they both intended to establish a home and life—that, while perhaps not permanent, was more than "transitory," *id.* at 76—for their family in Portugal:

a.      In September 2021—approximately three years before the family relocated to Portugal—Tenorio began preparing a Portuguese Golden Visa application with attorney Pereirinha, in the hopes of obtaining Portuguese citizenship for himself and his family.  FOF ¶ 21.  Vieira agreed to this plan, authorizing Pereirinha to prepare a Portuguese residency application for herself.  *Id.* ¶ 22.

b.      Tenorio and Vieira purchased two properties in Portugal.  First, after reviewing properties together, they purchased the apartment in December 2021.

FOF ¶¶ 23–24.  Second, after traveling to Portugal on her own to view properties, Vieira selected the house they purchased as co-owners in July 2023.  *Id.* ¶¶ 25–26.  The apartment is in Tenorio's name only.  *Id.* ¶ 24.  Both Tenorio and Vieira are listed as registered owners of the house.  *Id.* ¶ 26.

      c.     Tenorio and Vieira invested significant time, money, and resources to renovate and customize the Portugal house to suit their family's needs.  FOF ¶¶ 28–32.  Their real estate agent, architect, and contractor all credibly testified as to their understanding that Vieira was excited to move to Portugal and was focused on preparing the home so her family could reside there.  *Id.* ¶¶ 25, 28–32.[7]

      d.     In further anticipation of the move, Tenorio and Vieira arranged for S.E.V.T. and P.A. to attend school in Portugal during the 2024-2025 school year.  FOF ¶¶ 33–34.  Vieira prepared the school applications a year before the family moved, and approximately one month before the move, they unenrolled S.E.V.T. from his school in New York.  *Id.*  Tenorio also obtained medical insurance in Portugal for the family and purchased a car for their use there.  *Id.* ¶ 35.

---

[7] Vieira makes a general credibility attack on Reis, Pietro Vasconcelos, Amaral, and DaFonseca, suggesting their testimony is entitled to less weight, because (1) they were paid by Tenorio for services related to the family's property acquisitions in Portugal, and (2) none of the witnesses had spoken to Vieira since 2023.  (Resp't's Post-Hearing Mem. of Law dated May 9, 2025 ("Resp't's Post-Hearing Br."), Dkt. No. 34 at 7–8).  The Court has taken these considerations into account and evaluated the weight given to each witness's testimony.  That said, and as discussed below, Vieira offered no evidence to refute many of the subjects discussed by these witnesses.  Namely, that she expressed an interest in moving to Portugal beginning roughly three years prior to the family's relocation and took affirmative steps to facilitate that move.

> e.    Tenorio, Vieira, S.E.V.T., and P.A. flew to Portugal on one-way plane tickets on August 11, 2024.  FOF ¶ 42.  They brought with them seven suitcases "with everything[.]"  *Id.* ¶ 39.

12.    In addition to actions taken jointly, Tenorio took steps to reduce the family's presence in New York.  He sold the family's Garden City house to fund his investments in Portugal, wound-down his New York construction business, and cancelled S.E.V.T., P.A., and Vieira's U.S. health insurance.  FOF ¶¶ 36, 41; (Trial Tr. (Tenorio) at 92:9–93:6).

13.    Vieira contends that, despite these actions taken by Tenorio (which she does not dispute), Tenorio maintained significant ties with the U.S., purportedly evincing his intent to return to New York.  (Resp't's Post-Hearing Br. at 10).  For example, the family renovated the Franklin Square home prior to moving and kept two vehicles there; Tenorio kept his U.S. bank accounts and health insurance; and Tenorio did not sell his other U.S. properties, including the Franklin Square home where Brenda was living when Tenorio and Vieira left.  FOF ¶¶ 37–40.

14.    On the whole, however, the New York ties pale in comparison to the ties Tenorio has made in Portugal.  Tenorio's business interests in the United States are being wound down, FOF ¶ 41; he has accepted a full-time position in a company based in Portugal, FOF ¶ 52; he is a permanent resident of Portugal and his Portuguese Golden Visa Application has proceeded apace.  FOF ¶ 21.  To the extent that Vieira is attempting to demonstrate—using Tenorio's remaining New York ties—that they did

not intend to leave the United States and relocate to Portugal indefinitely, the evidence is simply unpersuasive and insufficient for such a conclusion.

15.    Though Tenorio spends significant time discussing S.E.V.T.'s alleged acclimation to life in Portugal, he does so largely without reference to any legal context. To be sure, a child's acclimation to a particular place is an important consideration in determining habitual residence. *Grano*, 821 F. App'x at 27; *Monasky*, 589 U.S. at 78. But some children are "too young . . . to acclimate." *Monasky*, 589 U.S. at 78; *e.g.*, *Nisbet*, 124 F.4th at 586 ("A child—like ACN, less than four and a half years old . . . is unable to acclimate due to his very young age[.]"). And whatever the child's age, the overall length of time in a place can place limitations on the degree to which any person can acclimatize to a new place. *E.g.*, *Neiuwenhoven v. Pisani*, No. 23-CV-34, 2023 WL 4930852, at *3 (M.D. Fla. Feb. 23, 2023) ("Despite testimony from the Respondent and her mother that the Minor Child has attended a school and has engaged in other family and community activities since arriving in Florida seven months ago, there has not been a sufficient passage of time to evidence acclimatization to a new environment."); *Roberts v. Roberts*, No. 24-CV-817, 2024 WL 5191971, at *7 (E.D. Va. Dec. 20, 2024) ("[T]en months does not appear to be enough time for even an older child to acclimate to a new country, especially when they have spent most of their life in another country."); *Argueta v. Argueta-Ugalda*, No. 22-CV-12840, 2023 WL 1466820, at *8 (E.D. Mich. Feb. 2, 2023) ("[G]iven how strong and continuous her ties have been with Brazil, the Court finds that M.A.'s four months in the United States were not sufficient to acclimate her

such that her habitual residence changed. This is especially true given she has spent less time in the United States than she did while in China and Mexico.").

16. While S.E.V.T.'s actual presence in Portugal lasted only a few months (from August to December 2024)—a short duration that weighs against a finding that he acclimated to life in Portugal, *see* COL ¶¶ 6–8, 15—the ties and connections he did forge there are far more substantial and significant than those associated with a temporary change or vacation. S.E.V.T. attended school in Portugal; participated in numerous field trips, cultural excursions, and extracurricular activities; spent considerable time with Vieira's sisters and their children; and developed friendships with his peers and the son of his parents' close family friends. FOF ¶¶ 53, 55–57. And other than preschool enrollment and ties with his sister in New York, *see* FOF ¶ 34; (Trial Tr. (Humburger) at 202:3–5), Vieira has presented no facts to suggest that prior to moving to Portugal, S.E.V.T. had acclimated to life in the United States.

17. Indeed, had it not been for Vieira's own actions to interrupt and sever these social and educational ties, there was every indication that S.E.V.T. was building a foundation for long-lasting connections to Portugal. And although S.E.V.T. was (and remains) quite young, he is not a toddler. The Court therefore cannot entirely discount the facts suggesting some acclimation to life in Portugal, notwithstanding the short duration or S.E.V.T.'s relative youth. By analog, in *Baz v. Patterson*, the Seventh Circuit explained:

> The evidence of acclimatization [of the five year-old child] included the following points: A.P. had been attending kindergarten and was set to begin first grade in Germany; he had participated in extracurricular activities in Germany; he spoke German and his schooling, extracurriculars,

and medical services were conducted in that language; he had friends and extended family in Germany; he visited the United States only during school breaks; and neither the Illinois Allocation Judgment nor any other evidence indicated that the parents had made plans for A.P. to return permanently to the United States. In the light of these competing factors, we see no clear error in the district court's weighing of the evidence.

100 F.4th 854, 869–70 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1049 (2025); *see also Gomez v. Gonzalez*, 771 F. Supp. 3d 1150, 1158 (W.D. Wash. 2025):

> ACPR was young in August 2023, having just turned six, but she was not an infant whose experience should only be determined by the experience of her parents. For three years in Mexico, ACPR went to school and had a relationship with her classmates and teacher. She also had relationships with Petitioner's family and other children her age. She celebrated holidays and participated in local cultural celebrations, and the record reflects that Petitioner and Respondent intended that ACPR would attend school in Mexico City for the 2023/2024 school year. . . . These facts support that ACPR's life in Mexico was not transitory.

18.  There are, of course, some facts that counsel against finding Portugal as S.E.V.T.'s habitual residence. He is a U.S. citizen, was born here, and has spent the overwhelming duration of his life, save a few months, living in New York. These ties are not insignificant. *E.g., de Jesus Joya Rubio v. Alvarez*, 526 F. Supp. 3d 1186, 1200 (S. D. Fla. 2021) ("This finding [of Mexico as R.M.J.M.'s habitual residence] is based on R.M.J.M. residing in Mexico for three years; being a birthright citizen of Mexico; attending school in Mexico; and having an otherwise active social life in Mexico[.]"); *Staggers v. Timmerman*, 746 F. Supp. 3d 635, 663 (S. D. Iowa 2024) (Because "E.L.S. was born in the United States, is a United States citizen, and has lived most of her young life in the United States," "the record . . . falls short of establishing by a preponderance of the evidence that Mexico was the habitual residence of E.L.S.") (adopting report and recommendation).

19.     But considering the overall facts and circumstances here—parents who took affirmative steps to set up a life in Portugal, when S.E.V.T. was very young, and a mélange of meaningful family, social, and school ties—it is impossible to escape the conclusion that S.E.V.T. was habitually resident in Portugal in December 2024.

20.     Other courts have reached the same conclusion in similar cases.  For example, in *Matter of E.Z.*, the parents had spent approximately three years discussing where to move before ultimately relocating to Iceland with their two children who were seven and two years old.  No. 21-CV-6524, 2021 WL 5106637, at *1 (S.D.N.Y. Nov. 2, 2021).  The father filed a Hague petition after the mother took their children to New York without the father's knowledge or consent, after living in Iceland for one year.  *Id.* The father conceded that the move to Iceland was for a trial, indefinite period, and not necessarily permanent.  *Id.* at *20.  Still, the Court found that Iceland was the children's habitual residence: the parents discussed leaving New York for years prior to their move; purchased a home in Iceland and discussed making renovations thereto; moved the majority of their personal possessions to Iceland; and attempted to sell their New York residence after purchasing the Iceland home.  *Id.* at *20.  The father had also quit his job in New York and obtained new employment in Iceland; the parents researched opportunities for their children in Iceland, obtained Icelandic citizenship for them, and enrolled them in school and extracurricular activities in Iceland; and the children showed evidence of acclimation, including time spent socializing with new friends, participation in family gatherings, and trips to various cultural attractions and other local sights.  *Id.* at *21–*22, *24.

21.     Similar circumstances were also present in *Grano v. Martin*:

> [W]hen [Respondent] and the Child flew to Spain on October 3, 2017, they
> did so on a one-way ticket . . . . [The parents] engaged in activities in Spain
> consistent with being a couple intending to raise their child in that country,
> including finding a school for the Child, buying a house together, and
> making decisions about the design and furnishing of the house. . . . In July
> 2018, Martin and Grano signed the deed to a house in Spain, and they began
> to live there as a family.

821 F. App'x at 28.  On that record, the Second Circuit held that the "district court did

not clearly err in finding that the totality of the circumstances showed that the Child's

habitual residence was in Spain." *Id.*

22.     *Reid v. Remekie* is also instructive.  There, the Court considered as

circumstantial evidence of the respondent-mother's intent to move to Jamaica the fact

that she had spent years discussing and preparing for the family's move and played an

active role in selecting and furnishing a house for the family there.  No. 25-CV-904, 2025

WL 1769364, at *12 (E.D.N.Y. June 26, 2025).  The Court found significant that, while in

Jamaica, the family's 3.5 and 2-year-old children "attend[ed] daycare and

extracurricular activities, receive[d] routine medical and dental care, and participate[d]

in playdates and family and cultural activities."  *Id.* at *13.  Thus, the Court held, "[t]his

evidence of acclimation indicates that the children's habitual residence had changed

from New York to Jamaica[.]"  *Id.*

23.     This trifecta of cases, all of which are post-*Monasksy*, suggests that here,

where parental intentions and actions—long-term planning for a move, an almost

complete relocation—combined with some evidence of acclimation—including school

enrollment, social interactions, and family ties—can anchor the child's habitual

residence in a new country.  And while one parent may have regrets about such arrangements and legitimate and reasonable reasons to want to return, such change of heart is not sufficient to shift the child's habitual residence back to the United States. That is precisely the case here.

24.     The cases cited by Vieira are inapposite.  In *Roberts v. Roberts*, the District Court concluded that England was not the child's habitual residence, because the parents were there "for a specific and delimited period"—namely, the father's military tour.  No. 24-CV-817, 2024 WL 5191971, at *5 (E.D. Va. Dec. 20, 2024) (cited by Resp't's Post-Hearing Br. at 12).  Indeed, the Court noted that "military families do not present the typical fact pattern and concluded that conditional stays may not demonstrate a shared intention to shift a child's habitual residence away from the country where they previously resided."  *Id.* at *4.  The *sui generis* nature of military relocations presents factual circumstances unlike the present case.

25.     In *Nolla v. Vargas*, also relied upon by Vieira, (Resp't's Post-Hearing Br. at 12–13), the parents offered contradictory testimony regarding their intentions toward their relocation to Mexico similar to that proffered here.  2024 WL 2976749, at *19–*20, *22.  But the facts were quite different.  For example, the mother in *Nolla* had no knowledge of the father's plan to move from the U.S. until shortly before their move to Mexico, and while in Mexico, the mother and child lived in a rented home an hour away from the father.  *Id.* at *19.  Moreover, unlike S.E.V.T., the 5-year-old child in *Nolla* rarely saw his extended family in Mexico, did not attend school or participate in other activities there, and seldom left his mother's home.  *Id.* at *22.  And because of his

autism disorder, the child was largely non-verbal, and dependent on his care-giver; as a result, there was almost zero evidence of acclimation to Mexico.  *Id.* at *19.  To say the least, the evidence of mutual parental intention, planning, and acclimation are quite different in this case.

26.     Vieira's principal, and only, defense to the return of S.E.V.T. to Portugal is that she was economically coerced to move to Portugal.  Though not formally recognized as an "affirmative defense" under the Convention, coercion is relevant to the habitual residence inquiry—*see* COL ¶ 9—because evidence of a coerced or involuntary move to another country weighs against finding that this new country is a place of habitual residence—at least one parent did not agree to settle or remain there at all.

27.     There is little doubt that Vieira was entirely economically dependent on Tenorio.  And there is some evidence that because of this economic dependence she was coerced to move to Portugal, even though she objected to so doing.  Tenorio does little to dispute this, instead relying largely on Vieira's pre-August 2024 conduct to suggest that she moved voluntarily.

28.     The evidence of Vieira's economic dependency on Tenorio is as follows and was unrebutted:

a.     Beginning sometime in 2016, after Vieira lost her job in Brazil, Tenorio started providing financial support to Vieira and her children.  (Trial Tr. (Tenorio) at 22:23–23:5).

b.      Vieira had no independent source of income after marrying Tenorio.  They entered into a prenuptial agreement, FOF ¶ 14, and Tenorio told Vieira that he would pay for all her expenses during their marriage.  She stated: "[H]e was always a provider.  Those are the terms that I came in and got with him since day one.  It was always I will always provide for you."  (Apr. 10 Trial Tr. (Vieira) at 133:2–4).  Tenorio never wanted her to work, she had no other source of income other than the money Tenorio would give her, and "[Tenorio] was fully aware that [she] had no other source of income and he was the only source of income."  (*Id.* at 133:5–8, 168:19–21).  Vieira explained that Tenorio "always gave [her] money," such as a certain allotment on different debit or credit cards, but that "he always had control, and he was always aware of everything that I [spent]."  (*Id.* at 133:17–134:5).

c.      Tenorio paid for P.A.'s U.S. citizenship expenses including hiring counsel and covering application fees.  (Trial Tr. (Tenorio) at 24:10–17).  He also paid for Vieira's sisters and their children to relocate from Brazil to Porto.  FOF ¶¶ 54–55.

29.      Before leaving for Portugal, Tenorio threatened Vieira that, if she did not go to Portugal, he would throw her out and she would have to live "in the street."  FOF ¶ 43.  Tenorio admitted to fighting with Vieira during the two weeks before they left, telling her that if she did not go to Portugal, she would no longer be able to live in his house in New York.  *Id.; see also* (Trial Tr. (Puccio) at 215:11–13 ("I felt like [Vieira] was always feel[ing] threatened by [Tenorio], you know financial[ly], because when you have financial control you have the power.")).

30.     Though significant and unrefuted, this evidence of financial dependency and threat is insufficient to preclude a finding that Portugal was S.E.V.T.'s habitual residence.  Nothing in *Monasky* suggests that evidence of coercion should be viewed in isolation from other factors relevant to the habitual residence inquiry.  To the contrary, *Monasky* requires a totality of circumstances approach, noting ony that circumstances of coercion "should figure in the calculus."  *Monasky*, 589 U.S. at 78.  And circumstances sufficient to find that habitual residence was coerced have involved serious violence or a substantial degree of involuntary action—elements not present here.  *See Tsuruta v. Tsuruta*, 76 F.4th 1107, 1111 (8th Cir. 2023) ("There is no evidence of physical abuse, violence, or threats of violence in this case.  Additionally, having considered the testimony of Petitioner and Respondent and having reviewed the text message exchanges between the parties, the court does not find evidence of the type of verbal abuse or controlling behavior that would suggest that Petitioner was coerced or forced into staying in Japan." (quoting district court's factual findings)).

31.     For example, in *Sarzosa v. Enriquez*, the Court denied the father's petition, due in part to evidence that he forced the mother—and by extension, the child—to remain in Ecuador against her will.  No. 24-CV-89, 2024 WL 3976846, at *5, *8 (S.D. Tex. Aug. 28, 2024).  The father stole from the mother's possession and hid her and the child's U.S. residency documents, unilaterally altered the child's birth certificate, and registered the child as an Ecuadorian citizen, rendering it impossible for the child to leave Ecuador without the father's permission.  *Id.* at *5.  Such evidence is lacking here.  *See also Gomez*, 771 F. Supp. 3d at 1158 ("Respondent failed to establish that from the

beginning of 2022 to August 2023 she only remained in Mexico due to Petitioner's coercion. While Respondent credibly testified that Petitioner had withheld her and ACPR's travel documents at some point during the relevant period, Respondent did not testify that she was unable to travel as a result or that lack of documentation kept her in Mexico.").

32.     Nor is this case like *Nisbet v. Bridger*, wherein the Court held that the petitioner-father's storied history of coercive, manipulative, and violent behavior directed at the respondent-mother, including threats to her and the children's safety if the mother did not heed the father's demands, supported a finding that the children had no habitual residence at the time of removal. No. 23-CV-850, 2023 WL 6998081, at *4, *7 (D. Or. Oct. 24, 2023), *aff'd*, 124 F.4th 577 (9th Cir. 2024).

33.     As noted, even when there is significant coercion that impedes or influences a parent's choice of residence for their child, a court cannot ignore other evidence regarding the child's habitual residence. (To analyze coercion differently would run afoul of *Monasky*'s admonition that no single factor is dispositive. *Monasky*, 589 U.S. at 78). Indeed, in *Grano*, the district court found that the abuse of the mother, disparaging treatment, and control over all aspects of the mother's life, including her finances and employment, reflected significant coercive behavior. *Grano v. Martin*, 443 F. Supp. 3d 510, 532 (S.D.N.Y), *aff'd*, 821 F.App'x at 29. Still, the Court held that the mother's decision to remain with the child in Spain was voluntary, she made many significant voluntary decisions, and the child's ties to Spain tipped the balance to find that the child's habitual residence was Spain. *Id.* at 540–41; *Grano*, 821 F. App'x at 28

("Martin and Grano engaged in activities in Spain consistent with being a couple intending to raise their child in that country, including finding a school for the Child, buying a house together, and making decisions about the design and furnishing of the house.").

34.    There is no doubt that Vieira took steps to establish residence in Portugal. Those were voluntary steps that took place over at least a two-year period, including looking for houses; meeting with lawyers, real estate agents, and contractors; designing a home; and seeking out schools for her children.  It is also without rebuttal that Vieira voluntarily agreed to try living in Portugal for some indefinite period of time.  But what is also unrebutted by Tenorio is that Vieira changed her mind prior to or at the moment she was to fly to Portugal.  The reasons for this may have been a breakdown of the marriage, the stark reality of what it meant to move to Portugal, or mere change of mind.  Whatever the reason, when she left New York, she did so unhappily, and to some degree, under economic coercion and threat.  Tenorio does not grapple with this reality.  Unfortunately for Vieira, her change of heart and economic pressure, while significant, are insufficient to refuse return of the child in light of the other factors suggesting Portugal is his habitual residence.  These include S.E.V.T.'s schooling, social activities, and family ties to the area; the family's home and connections in Porto; and the credible testimony of non-party witnesses who believed Tenorio and Vieira were establishing roots in the community and building a life there for their family.  Thus, accounting for Tenorio's considerable economic control over Vieira, the totality of circumstances renders clear that S.E.V.T.'s habitual residence at the time of removal was

Portugal.  *E.g.*, *Grano*, 443. F Supp. 3d at 540–41; *Gomez*, 771 F. Supp. 3d at 1159 ("The Court has no doubt that Respondent suffered in Mexico, and at some point decided to leave, but she has not established that only circumstances out of her control kept her and ACPR in Mexico such that ACPR's relationships and connections in Mexico should be ignored.").

35.    Having established Portugal was S.E.V.T.'s habitual residence, the Court must determine whether Vieira's removal of S.E.V.T was in violation of Tenorio's custody rights.  This inquiry is governed by the law of the child's place of residence. Convention, art. 3(a); *Abbott v. Abbott*, 560 U.S. 1, 8, 10 (2010).  Accordingly, Portuguese law applies to determine Tenorio's custody rights.  Convention, art. 3(a).

36.    Tenorio asserts that under Portuguese law, the unilateral taking of a child by one parent violates the custody rights of the non-consenting parent.  (Pet'r's Proposed Findings of Fact & Conclusions of Law dated May 9, 2025, Dkt. No. 35 ¶ 182); *see* Portuguese Civ. Code art. 1901(1) ("During marriage, the exercise of parental responsibilities belongs to both parents.").[8]  Vieira does not dispute Tenorio's

---

[8] *See generally* Ana Rita Ferreira & Ana Isabel Sani, *Domestic Violence & Custody Proceedings: An Analysis of Judicial Decisions in Portugal*, J. Fam. Violence (2024), https://doi.org/10.1007/s10896-024-00739-3 ("The Portuguese term for a child custody determination is translated as 'parental responsibilities,' and it is defined in Article 1888 of the Portuguese Civil Code (PCC).  This article states that, in the interests of their children, parents have a duty to ensure their health and safety, provide for their livelihood, direct their education, represent them, and manage their assets.  Moreover, Subsection IV, Article 1906—which addresses parental responsibilities in the case of divorce, the legal separation of people and property, and a declaration of nullity or annulment of a marriage—decrees that parental responsibilities must be shared, especially for issues of particular importance to the child's life.").

interpretation of Portuguese law or cite to any contrary legal provisions.  (*See* Resp't's Post-Hearing Br.; Resp't's Post-Hearing Reply Mem. of Law dated May 16, 2025, Dkt. No. 40).  Rather, Vieira contends that the testimony of Tenorio's expert witness, Isabel Malheiro, regarding Portuguese family law is inadmissible because Vieira was not provided with an expert report.  (Resp't's Letter dated May 16, 2025, Dkt. No. 39 at 1). Yet because Vieira's defense to the Petition rests solely on the position that S.E.V.T. was not habitually resident in Portugal because of Tenorio's economic coercion, the Court need not consider expert testimony that purports to bolster Tenorio's unopposed statement of applicable law, which appears facially correct, and for which no authority to the contrary has been offered.[9]  *See De Oliveira v. Campbell*, 2019 CarswellBC 1067, ¶ 7 (Can. B.C.S.C.) (WL);[10] *see also Monasky*, 589 U.S. at 79 ("ICARA expressly recognizes 'the need for uniform international interpretation of the Convention.' . . . The understanding that the opinions of our sister signatories to a treaty are due 'considerable weight,' this Court has said, has 'special force' in Hague Convention cases." (international citations omitted)).

---

[9] "In determining foreign law, the court may consider any relevant material or source, . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence."  *Tatari v. Durust*, No. 25-253, 2025 WL 947009, at *1 (2d Cir. Mar. 28, 2025).

[10] "According to the undisputed evidence about Portuguese law, . . . under Article 1901 of the *Portuguese Civil Code* both parents of a child have custody rights and parental responsibility for that child while they live together.  Under Article 1906, those joint rights continue after the parents separate unless deemed contrary to the interests of the child, in which case a Portuguese court may order that custody rights and parental responsibilities be exercised solely by one of the parents."  *De Oliveira*, 2019 CarswellBC 1067, ¶ 7.

37. Here, it is undisputed that Vieira took S.E.V.T. to New York without Tenorio's prior knowledge or consent and refused to return with S.E.V.T. to Portugal. FOF ¶¶ 64–65. As such, Vieira's removal of S.E.V.T. was in violation of Tenorio's custody rights under Portuguese law, which precludes one parent from making unilateral decisions on significant matters affecting a child. *See De Oliveira*, 2019 CarswellBC 1067, ¶¶ 39, 53.

38. Having established that S.E.V.T. was habitually resident in Portugal at the time of removal, and Vieira's removal of S.E.V.T. was in breach of Tenorio's custody rights under Portuguese law, all that remains for Tenorio to prevail is a determination that he was exercising his parenting rights at the time of removal. *See* COL ¶ 5. It is plain that Tenorio was exercising his rights as S.E.V.T.'s father—he lived with S.E.V.T. and played an active role in his life, they took trips together, he obtained health insurance for him, and enrolled him in school, among other things. *E.g.*, FOF ¶¶ 34–35, 53; *Reid*, 2025 WL 1769364, at *13. Accordingly, the Court concludes that Tenorio has established by a preponderance of evidence that S.E.V.T. was wrongfully removed from his habitual residence of Portugal.

39. "If a petitioner prevails in a return action brought . . . the court ordinarily must 'order the return of the child forthwith.'" *Ozaltin*, 708 F.3d at 360 (quoting Convention art. 12). For the reasons set forth above, the Court grants the Petition and orders the return of S.E.V.T. to Portugal to be accomplished forthwith, and no later than August 4th, 2025.

40.     The Court is empowered to impose undertakings or ameliorative measures along with the return remedy.  *See Tereshchenko*, 102 F.4th at 132; *Grano*, 821 F. App'x at 29.  "Where a district court orders the return of a child, it has 'broad equitable discretion' to impose conditions to protect the child."  *Grano*, 821 F. App'x at 29 (quoting *Blondin v. Dubois*, 189 F.3d 240, 249 (2d Cir. 1999)).  "Typical undertakings concern support, housing and the child's care pending resolution of the custody contest."  *Id.* (quoting *Blondin v. Dubois*, 238 F.3d 153 at 159 n.8 (2d Cir. 2001)).

41.     In light of the serious financial coercion present in this case, Vieira's total economic dependence on Tenorio, and her complete lack of independent resources, the Court imposes the following conditions on the child's return: Tenorio is directed to pay for Vieira and S.E.V.T.'s return to Portugal, including any flight and travel arrangements, and must provide them with financial support—including for education, medical, and independent living expenses, while in Portugal and until the termination of any custody proceedings in Portugal or any issuance of support orders by a court in Portugal.  *See Golan v. Saada*, 596 U.S. 666, 679 (2022) (district courts "should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case"); *Rial v. Rijo*, No. 10-CV-1578, 2010 WL 1643995, at *3 (S.D.N.Y. Apr. 23, 2010) (requiring non-abducting parent to rent apartment and pay child support to facilitate mother and child's return to Spain).  Tenorio must also provide the same financial support for P.A., Vieira's other minor child, so that Vieira is not separated from him, and so that S.E.V.T. is also not separated from his sibling, with whom he is very close.  (Trial Tr. (Tenorio) at 31:13–18; *see Ermini*, 758 F.3d at 167 ("[I]n

light of the children's close relationship to each other . . . it was not error for the district court to decline to separate the children.").

CONCLUSION

The Court grants the Petition and orders the prompt return of S.E.V.T. to Portugal, subject to the financial undertakings to be satisfied by Petitioner.  S.E.V.T. is to be returned to Portugal, in Respondent's care, for custody proceedings to take place there.  The return should be effectuated no later than August 4th, 2025.


SO ORDERED.

Dated: July 14, 2025                        */s/ Sanket J. Bulsara*
       Central Islip, New York              SANKET J. BULSARA
                                            United States District Judge